## HOOKER CHEMICAL CORPORATION
### v.
## VELSICOL CHEMICAL CORPORATION.
### Civ. No. 4412.

United States District Court
W. D. Tennessee, W. D.
Sept. 18, 1964.

Dean Laurence, Herbert I. Sherman, Washington, D. C., S. Shepherd Tate, Memphis, Tenn., Lon P. MacFarland, Columbia, Tenn., for plaintiff.

Albert E. Jenner, Jr., Philip W. Tone, Donald R. Harris, Chicago, Ill., Frank J. Glankler, Jr., Donald W. Pemberton, Memphis, Tenn., for defendant.

BAILEY BROWN, District Judge.

### Nature of Action

This is an action on a written licensing agreement seeking to recover royalties and seeking other relief. Under this Agreement, entered into in 1951, Hooker Chemical Corp. (Hooker) licensed to Velsicol Chemical Corp. (Velsicol) the "Know-How of Hooker" and "Licensed Patent Rights" of Hooker to make hexachlorocyclopentadiene. (Hexachlorocyclopentadiene is frequently referred to in the record and will be referred to in this memorandum decision as "hex" or "C56", C56 being a trade name of Hooker.) It

is the contention of the plaintiff, Hooker, that the defendant, Velsicol, is using the "Know-How of Hooker" and the "Licensed Patent Rights of Hooker" in its Memphis hex plant constructed in 1960. It is the contention of Velsicol that it is not using such Know-How and is not using such Licensed Patent Rights.

### Pre-Trial Proceedings and the Trial

Prior to the trial of this action, two pre-trial conferences were held. The first such conference resulted in an order granting Hooker full discovery as to the Velsicol hex operation at Memphis but limiting the persons who might participate in the discovery and protecting the secrecy of the information ascertained. The second such conference resulted in an order narrowing the substantive issues. Also, prior to the trial, both parties filed memoranda covering their factual and legal contentions.

This action then came on for trial, without a jury, and consumed six very full weeks. The transcript of the testimony contains approximately ten thousand pages, and there are over five hundred exhibits. Much of the testimony came from experts in chemistry and chemical engineering. Subsequent to the trial, both parties filed full briefs, reviewing the evidence and setting out their factual and legal contentions.

### Chemistry Involved

As some knowledge of the chemistry involved is necessary for an understanding of the issues and this opinion, we will first make a brief excursion into the chemistry. We will assume that the reader of this memorandum decision is, as was this Court prior to the beginning of this action, without knowledge in the field of chemistry. What we have to say about the chemistry is taken from the briefs of and is undisputed by the parties, and therefore, at least for purposes of this action, is true.

All matter is made up of various elements, and all atoms of a particular element are the same. A molecule is made up of two or more atoms. In this case, we will be dealing with only three elements: carbon (C), hydrogen (H), and chlorine (Cl).

The atoms of each element have a characteristic number of valence bonds. Valence bonds are the points of attachment between atoms, and it is by this attachment of atoms that molecules are formed. Carbon has four valence bonds, hydrogen has one, and chlorine has one. To illustrate, a molecule of methane, containing one carbon atom and four hydrogen atoms, can be shown, in structural formula, as follows:

The lines between the atoms indicate valence bonds. The four valence bonds of the carbon atom are satisfied by the single bond of each hydrogen atom.

A carbon atom may be double bonded. That is, two of its valence bonds may be satisfied by bonding with two valence bonds of another atom. For example, two adjacent carbon atoms may be attached by double bonds, and their remaining valence bonds satisfied by other atoms. This can be illustrated by a molecule containing two carbon atoms, double bonded, and four hydrogen atoms, the structural formula being:

When the atoms in a molecule are all single bonded, the molecule is said to be saturated; if there is a double bond in the molecule, it is said to be unsaturated.

Both Hooker and Velsicol use a five-carbon-atom hydrocarbon as a starting material. Hooker's starting material is called normal pentane, so called because

the carbon atoms are in a straight chain and there are five of them. The structural formula for normal pentane may be shown as follows:

$$H-\underset{\underset{H}{|}}{\overset{\overset{H}{|}}{C}}-\underset{\underset{H}{|}}{\overset{\overset{H}{|}}{C}}-\underset{\underset{H}{|}}{\overset{\overset{H}{|}}{C}}-\underset{\underset{H}{|}}{\overset{\overset{H}{|}}{C}}-\underset{\underset{H}{|}}{\overset{\overset{H}{|}}{C}}-H$$

Velsicol's starting material is called cyclopentadiene ("cyclo"), and here we introduce still another concept, which is that the carbon atoms in the molecule may present a ring structure rather than a straight chain structure. The structural formula of this starting material is:

Again, the name cyclopentadiene is descriptive: "cyclo" indicates the ring structure, "penta" indicates that there are five carbon atoms, "ene" indicates the double-bonded, or unsaturated, character of the molecule, and the preceding syllable "di" indicates that the molecule is unsaturated twice.

The end product, hexachlorocyclopentadiene ($C_5 Cl_6$) is a cyclic molecule and has five carbon atoms, no hydrogen, and six chlorine ("hexachloro") atoms and contains two double bonds. Its structural formula is:

Making hex therefore involves, for both parties, the elimination of all hydrogen from their five-carbon-atom hydrocarbon starting materials and the introduction of six chlorine atoms in these molecules. This latter process is called chlorination.

### Description of Hooker and of Velsicol Processes

Having covered the basic chemistry involved here, it would be well next to describe, in general, the process for making hex used by Hooker and made available to Velsicol under the Agreement licensing Know-How and Patent Rights and then to describe the process for making hex used by Velsicol at its Memphis plant.

As stated, Hooker starts with normal pentane (usually referred to simply as "pentane"), which it introduces as a gas into and dissolves in liquid partially chlorinated pentane or polychloropentane (PCP). At the same time it introduces into and dissolves gaseous chlorine in this liquid, and a reaction between the pentane and chlorine takes place, which results in the elimination of some of the hydrogen atoms of the pentane molecules and their replacement by chlorine atoms. This is called chlorination in the liquid phase. The reaction product is more liquid PCP. This reaction is carried out at a relatively low temperature and is photochemically catalyzed by ultraviolet light which is present in the reactor. From this reaction chamber, liquid PCP of suitable specific gravity for further chlorination at high temperature in vapor phase is continuously drawn off and is sent on for this further chlorination. A small amount of this reaction product, which is under-chlorinated, is sent through a photochemical after-chlorinator for further chlorination, but the Hooker liquid-phase, low-temperature chlorination is essentially in one step.

The liquid PCP thus produced in the first step chlorination, and which is to be further chlorinated in vapor phase at high temperatures, is passed, together with excess chlorine not consumed in this first reaction, into a vaporizer and the PCP is by heat vaporized. The vaporized PCP

and chlorine are then introduced, as a second step in the chlorination, into a thermocatalytic chlorinator, wherein the PCP and chlorine are subjected to heat and a packed fuller's earth catalyst, further chlorination takes place, and the structure of the molecules becomes cyclical. Here about 90% of Hooker's hex is made. This second step of chlorination in the Hooker process is the first of two steps in the Hooker high-temperature, vapor-phase zone.

The gaseous effluent from this "cat" chlorinator contains not only, as stated, a large amount of hex but also contains a substantial amount of octachlorocyclopentene ($C_5Cl_8$), or "octa," the structural formula of which is:

Hooker then, as a third step, passes the vapors from the cat chlorinator through a unit which consists of a group of parallel nickel-alloy tubes heated inside a shell, where, at still higher temperatures, the "octa" is cracked to hex. Hooker calls this unit a "cracker" because of its primary function. It will also sometimes be referred to hereafter as a "hot tubes" reactor. This cracking involves eliminating two chlorine atoms and introducing a second double bond in the octa molecule. Hooker contends that the nickel present in these tubes acts as a catalyst in dechlorinating octa to hex.

The gaseous effluent from the cracker, which contains a high percentage of crude hex, is quickly cooled by being brought into contact with liquid crude hex. The unreacted chlorine and the hydrogen chloride in the effluent are separated from the crude hex and crude hex is further purified by distillation.

Velsicol's process also makes use of a relatively low-temperature, liquid-phase chlorination followed by a high-temperature, vapor-phase chlorination. Velsicol's liquid-phase chlorination, however, is in two steps and its vapor-phase is in one step, while, as has been seen, Hooker's liquid-phase chlorination is one step and its vapor-phase is in two steps.

Velsicol introduces and dissolves liquid cyclo, its starting material, into a reaction chamber containing liquid partially chlorinated cyclopentane or polychlorocyclopentane (PCCP). At the same time it introduces and dissolves gaseous chlorine into this PCCP. The chlorine and the cyclo then react, not in the presence of light, to form more PCCP. The aim of this first step of liquid-phase chlorination is to produce a PCCP of a degree of chlorination approximating tetrachlorocyclopentane, which has a structural formula:

This involves saturating both double bonds of the cyclo molecule by adding four chlorine atoms, leaving the six hydrogen atoms in the molecule. Velsicol calls the product of the first step of the liquid-phase chlorination, which is in great part tetrachlorocyclopentane, "PCL 1." PCL 1 is then drawn off and sent on to the second step of the liquid-phase chlorination.

In Velsicol's second step of the liquid-phase, low-temperature chlorination, PCL 1 is introduced into a reaction chamber containing a more highly chlorinated liquid PCCP and is dissolved therein. At the same time, gaseous chlorine is introduced and dissolved into this same more highly chlorinated PCCP. The chlorine and the PCL 1 then react, not in the presence of light, to form more of this more highly chlorinated PCCP. The aim of

this second step chlorination is to produce a PCCP of a degree of chlorination approximating hexachlorocyclopentane, which has a structural formula as follows:

```
 Cl Cl
 \ /
 C ------ C
 / | | \
 H | | H
 | |
 Cl | | Cl
 \ C C /
 / \
 H \ / H
 C
 / \
 Cl Cl
```

This involves removing two hydrogen atoms and substituting two chlorine atoms in the molecule of the tetrachlorocyclopentane contained in PCL 1. Velsicol calls the product of the second step of the liquid-phase chlorination, which is in great part hexachlorocyclopentane, "PCL 2." PCL 2 is then drawn off and is sent on for further chlorination in the high-temperature zone.

It should be noted here that the five carbon atoms in the ring of the cyclo molecule, with which Velsicol starts, maintain their ring structure throughout the first and second steps of chlorination and further that at the completion of the second step, to the extent that PCL 2 contains hexachlorocyclopentane, to make hex there only remains the elimination of four hydrogen atoms and the reintroduction of two double bonds. It appears, however, that PCL 2 contains some underchlorinated materials, requiring more chlorination to make hex, and it also contains a substantial amount of octa, which must be cracked to make hex.

PCL 2 is then by heat vaporized, additional gaseous chlorine being introduced at this point, and the vapor is passed through a group of parallel nickel-alloy tubes, the tubes being heated inside a shell, where the vapor is further heated. This unit, similar in appearance and design to Hooker's cracker, is variously referred to in this memorandum decision and in the record as a "hot tubes" reactor,

as the "H–10 unit" and, because of its outside appearance, as the "cigar." There a reaction takes place which converts the various PCL 2 components— hexachlorocyclopentane, octa, and underchlorinated materials—to hex.

The gaseous effluent from this high-temperature zone, which contains a high percentage of crude hex, is quickly cooled by being brought into contact with liquid crude hex. The unreacted chlorine and the hydrogen chloride in the effluent are separated from the crude hex and the crude hex is further purified by distillation.

Hex, incidentally, is used as an intermediate in the manufacture of insecticides and for other purposes, but we are not concerned here with its uses.

General Background of Controversy

For several years prior to the execution of this licensing Agreement with Hooker in 1951, Velsicol had manufactured hex in a plant at Marshall, Illinois, using a process involving the chlorination of cyclo with sodium hypochlorite. This is the Strauss process, and the hex so manufactured is referred to in the record as "Marshall hex" or "Strauss hex." This process does not, as do the Hooker process and the Velsicol-Memphis process, involve direct chlorination with elemental chlorine of the hydrocarbon starting materials.

After Velsicol had begun the manufacture of Strauss hex, Hooker, which had an agreement to finance research at Purdue University, with Purdue began to develop a process for the direct chlorination of pentane to make hex. Such a process, it became apparent by 1947, could make a much purer hex than did the Strauss process, obviating costly purification procedures to get pure grade hex. When Velsicol heard about this work, it became interested because its starting material, cyclo, was in short supply and its general need for hex, in making chlordane, was increasing. Accordingly, beginning in 1947, Velsicol made small purchases of this purer grade hex for purposes of testing, and to assist Velsicol

in evaluating this product, Hooker made certain technical information available to Velsicol.

Velsicol eventually decided, however, to continue to manufacture chlordane with Strauss hex, but in the meantime it had developed a new product, heptachlor, the production of which absolutely required a purer hex as a starting material, and it encouraged Hooker to increase its hex capacity. In September, 1950, Velsicol advised Hooker that it would need 300,000 pounds of hex in 1951 and 500,000 pounds a *month* in 1952. The production of hex in these quantities would require a substantial investment in new capacity by Hooker, and consequently Hooker expressed doubt as to the feasibility of its meeting Velsicol's hex requirements. Velsicol then considered the possibility of meeting its requirements by increasing its capacity to make Strauss hex and by further purifying the hex. The problem here was the short supply of cyclo and the cost of purification.

In October, 1950, Hooker advised Velsicol that it could commit itself to supply 50,000 pounds of hex per month by March, 1951. Velsicol offered to work out an agreement to supply to Hooker needed chlorine from Velsicol's existing chlorine plant at Memphis.

In December, 1950, Mr. Wilks, vice-president in charge of research and development for Velsicol, together with R. B. MacMullin, Velsicol's engineering consultant, visited Hooker at Niagara Falls and were shown a hex pilot plant. It might be well to digress here and insert a brief account of the history of the development of the Hooker process described in this opinion earlier, which is the process revealed to Mr. Wilks at this time. Even before around December, 1950, Hooker had been making hex, as stated, by direct chlorination and by using pentane as a starting material. The low-temperature, liquid phase step, using ultra-violet light as a catalyst and being essentially the same as that heretofore described, made use of the McBee-Devaney Patent No. 2,473,162, issued June 14, 1949, which Hooker had obtained

a license to use through its relation with Purdue. (Hooker does not claim Velsicol is using this patent.) At that time, the PCP produced in the liquid phase was then converted to hex by simply passing the PCP as a vapor with gaseous chlorine through a hot tube. This high-temperature, vapor-phase chlorination made use of the process claimed by the McBee-Baranauckas ("hot tube") Patent No. 2,509,160, issued May 23, 1950, which Hooker had obtained a license to use through Purdue. This is one of the two Hooker patents that Hooker is here claiming Velsicol is using.

When Wilks of Velsicol visited the Hooker pilot plant in December, 1950, Hooker was developing an improvement on the process just described. The liquid-phase, low-temperature chlorination procedure would remain the same and would produce the liquid PCP to be vaporized and chlorinated in a vapor-phase, high-temperature chlorination. Under the new process, however, after the PCP was vaporized, before passing it through hot tubes, it would first pass through a thermocatylitic chlorinator, packed with a fuller's earth catalyst, and then, at still higher temperatures, pass through the hot tubes. This improvement in the Hooker process of manufacturing hex is claimed by the Maude-Rosenberg Patent No. 2,650,942, issued September 1, 1953. Maude and Rosenberg were on the Hooker research staff. The claims of this patent cover both the cat chlorinator step and the following hot tube step in the making of hex with vaporized PCP as a feed material. Hooker does not contend Velsicol is using this Hooker patent.

It was the development and the introduction of this improved process using the cat chlorinator that made the Hooker process economically feasible. The prior process, i. e. liquid-phase photochemical chlorination (McBee-Devaney) followed only by hot-tube, vapor-phase chlorination (McBee-Baranauckas), had not produced an amount of hex, when compared with the amount of chlorine and pentane fed, to make the process profitable.

To further digress to complete the history of the development of the Hooker process: Maude and Rosenberg obtained a patent, No. 2,742,506, issued April 17, 1956, which claims in substance that if nickel or nickel-alloy tubes are used in the hot-tube step in the making of hex, the nickel will, acting as a catalyst, aid in dechlorinating to hex any octa that is contained in the vapor feed. This patent is referred to in the record as the "nickel" patent, and Hooker contends Velsicol is using it.

Following December, 1950, the parties kept in contact concerning the problem of meeting Velsicol's requirements. Hooker considered many possibilities for increasing the production of Hooker hex, even including the forming of a jointly owned subsidiary with Velsicol. The parties realized at the time that Velsicol's only alternative to supplying its needs with Hooker hex was to increase its production of Strauss hex, and Velsicol concluded that the purchase of Hooker hex was preferable because of the shortage of its starting material, cyclo, and the prospective savings to it in using Hooker hex.

In January, 1951, Velsicol expressed concern whether Hooker was willing to make the additional plant investment to supply Velsicol and for the first time inquired whether Hooker would license its process. Hooker replied that such a license would be improbable. However, in late February, 1951, Hooker advised Velsicol that it definitely would not be able to commit itself to supply Velsicol with 500,000 pounds of hex per month in 1952 and, at this meeting, the possibility of a license was explored by the parties.

By early March, Hooker had decided to grant Velsicol a license. Accordingly, it obtained from Purdue the authority to sub-license the McBee-Devaney patent covering photochemical, liquid-phase chlorination. A patent had not yet issued on the Maude-Rosenberg cat chlorinator —cum—hot tube improvement, but it was contemplated that this patent would, when issued, be covered by the license. It was thought by Hooker, and confirmed to Velsicol, that in view of the Maude-Rosenberg improvement, the McBee-Baranauckas "hot tube" patent would no longer be used in the process. Moreover, Hooker thought, in view of the poor results it had had, that the McBee-Baranauckas patent was of no real economic value in making hex. Therefore Hooker did not then seek from Purdue the authority to sub-license that patent. The invention which was the basis of the Maude-Rosenberg "nickel" patent had not yet been conceived. Hooker and Velsicol executed the licensing Agreement in April, 1951, but effective March 1, 1951, the Agreement covering "Know-How of Hooker" and "Licensed Patent Rights" and listing only the McBee-Devaney patent.

Subsequent to the execution of this licensing Agreement, Velsicol employed R. B. MacMullin and Associates, consulting engineers, to design a plant to use the Hooker process and to be constructed at Memphis. Concededly, Hooker made available to MacMullin and to Velsicol all necessary information to design such a plant. After the plant was designed, Velsicol purchased the equipment for installation, but later decided not to construct the plant and in 1954 sold the equipment to Hooker. Hooker was willing to and did pay Velsicol about twice what the equipment was worth to Hooker, because it desired to continue to sell hex to Velsicol. Hooker had been selling hex to Velsicol and by the time the decision not to construct the Memphis plant was made, Hooker by its improved process and increased capacity was able to supply Velsicol's needs. Velsicol remained a large customer of Hooker throughout the 1950's.

In 1957, Hooker raised the price of hex and Velsicol, exercising its rights under the licensing Agreement, sent its representatives to examine the Hooker plant at Niagara Falls and the newer plant at Montague, Michigan and otherwise collected further information from Hooker about its process for making hex. This effort in gathering information terminated in early 1958, and Velsicol at that

time took no steps to construct a hex plant.

In June, 1959, Hooker again raised the price of hex. In September, Velsicol became aware that new processes for recovering chlorine and hydrogen from hydrochloric acid were available, and the economic use of this by-product HCl was, Velsicol thought, the key to the economic manufacture of hex. Velsicol therefore decided to explore the possibility of making hex by direct chlorination using cyclo as a starting material. Cyclo had by then become available in sufficient quantities. Velsicol's hex purchase contract with Hooker for the calendar year 1961 could be cancelled only by giving notice prior to July 1, 1960, and therefore, if Velsicol was to cancel the purchase contract, it was necessary for Velsicol to know by that date whether it had a satisfactory process and it was necessary to have its new plant in operation by early 1961. Accordingly, in September, 1959, Velsicol entered into a crash program to develop a process, which it succeeded in doing and gave Hooker a cancellation notice in late June of 1960. It had its plant in operation at Memphis by early 1961. It now has a patent covering its process. (Hanna-Rudnitzki Patent No. 3,073,869 issued January 15, 1963).

Subsequent to receiving the cancellation notice and ascertaining that Velsicol was making hex by a new process, Hooker made several inquiries of Velsicol whether it was using Know-How and patent rights under such circumstances as would make it liable to Hooker for royalties. Velsicol denied that it was so using either such Know-How or patent rights, but Hooker, not satisfied with the answers to its inquiries, in the fall of 1961 filed this suit.

Does the Agreement With Respect to "Know-How" License Information or Does It License a Process?

With respect to the difficult and multifaceted question whether Velsicol, as a result of its Memphis hex operation, is obligated to pay royalties to Hooker for use of "Know-How of Hooker," we first must determine whether, along with certain patents, the Agreement licenses information or licenses a process. It is the contention of Hooker that the Agreement, properly interpreted, licenses the right to use certain information to be furnished by Hooker. It is the contention of Velsicol, on the other hand, that the Agreement, properly interpreted, licenses the right to use the Hooker process. Velsicol's contention may be more accurately stated by saying that it contends that it is not obligated to pay royalty on "Know-How of Hooker" unless the information imparted to it is used to manufacture hex by the Hooker process. This, however, amounts to contending that Hooker has only licensed and Velsicol is only obligated to pay Know-How royalty on the process.

The preamble to the Agreement reads as follows:

"Whereas, HOOKER represents that it has certain patent rights and Know-How necessary to the construction and operation of a plant for the manufacture of C56 and is willing to license VELSICOL to use its said rights and Know-How; and

"Whereas, VELSICOL is interested in obtaining the right to utilize the said rights and Know-How of HOOKER pertaining to the making of C56 · * * *."

The granting clause provides in part: "Article 2—The Grant.

"(A) Subject to the provisions of Article 5 hereof HOOKER hereby grants to VELSICOL a non-exclusive, non-assignable right and license under the Licensed Patent Rights to use the inventions therein described and claimed and to use the said Know-How of HOOKER."

The royalty provision reads in part as follows:

"Article 3—The Royalty.

"(A) During the life of this Agreement, VELSICOL shall pay HOOKER a royalty of one cent ($0.01) for each pound of C56 made

by it using the Licensed Patent Rights.

"(B) From the date of this Agreement and during the first five (5) years after the date of beginning operations hereunder by VELSICOL, which latter date shall be the last day of the first month in which production of C56 at the rate of at least one hundred thousand (100,000) pounds per month is accomplished by VELSICOL in accord with the Know-How of HOOKER, VELSICOL shall pay HOOKER a royalty of two cents ($0.02) for each pound of C56 made by it using the Know-How of HOOKER. During the next succeeding four (4) years after said five (5) year period, VELSICOL shall pay HOOKER one cent ($0.01) per pound of C56 made by VELSICOL using the Know-How of Hooker."

The term "Know-How of Hooker" is defined as follows:

"Article 1—Definitions.

 * * * * * *

"(B) The term 'Know-How of HOOKER,' as used herein, means all technical information necessary to design and operate a commercial plant capable of producing polychloropentanes by the photochemical chlorination in the liquid phase of a pentane and the thermocatalytic formation of C56 from polychloropentanes, including the recovery as muriatic acid of the hydrogen chloride thereby produced, and the recovery of by-product chlorocarbons."

It should be pointed out here that if Velsicol is correct in its contention that it is not obligated to pay Know-How royalty unless it is using the Hooker process, the process being generally described in the above-quoted definition of "Know-How of Hooker," Velsicol is clearly not obligated to pay such royalty. This is true because Velsicol is not using the Hooker process. It is not, in the liquid phase, producing polychloropentanes but rather polychlorocyclopentanes and, more importantly, is

not there using photochemical chlorination. Velsicol is not, in the vapor phase, forming C56 from polychloropentanes but rather from polychlorocyclopentanes. And, more importantly, it is not, in the vapor phase, making C56 by "thermocatalytic" formation as this word was intended to be used in the Agreement. This word was obviously intended to refer to Hooker's new cat (fuller's earth) chlorinator and was not intended to refer to the Maude-Rosenberg nickel tube cracker, claimed by Hooker to employ nickel as a catalyst in cracking octa to hex. The Maude-Rosenberg "nickel" patent had not been conceived at the time the Agreement was executed.

■ Accordingly, if this Court concluded that Velsicol's construction of the Agreement is correct, this conclusion would dispose of the Know-How part of this lawsuit. We cannot, however, reach that conclusion; on the contrary, it is our conclusion that the Agreement, properly interpreted, creates an obligation to pay royalty for use of information. We first consider the Agreement within its four corners and then consider parol evidence.

At the outset, it should be noted that the preamble refers to the licensing, not of a process, but of patents and of Know-How. Moreover, the granting clause conveys the right to use patents and Know-How, not a process. Nowhere in the Agreement is there a limitation on the use, or the manner of use, to which the Know-How imparted could be put by Velsicol. The royalty clause, with respect to Know-How, creates the obligation to pay royalty when production of hex at the rate of 100,000 pounds per month " * * * is accomplished by Velsicol in accord with the Know-How of Hooker * * *" and sets a royalty of 2 cents and later 1 cent per pound for hex made " * * * using the Know-How of Hooker * * *." Again, there is no reference to the use of a particular process.

In the definition of "Know-How of Hooker" contained in Article 1(B) of the Agreement, it is not defined as a process but rather is defined as all information

necessary to design and operate a plant for making hex by a particular process. The reference to the particular process in the definition is only to describe and delimit the technical information to be furnished. Clearly, the technical information, not the process, is the Know-How.

While the Court was reasonably sure at the trial that this was clearly the proper construction of the Agreement when considered within its four corners and that therefore extrinsic evidence probably should not be considered, we did admit such evidence. This evidence, we think, confirms our interpretation. It is true that the parties, in their preliminary memoranda, refer only to the licensing of and a single royalty on a process, and it is true that initial drafts of the Agreement prepared by Hooker embodied the same approach. However, it is also clear that, by the time the Agreement was executed, Hooker had changed its mind and wanted one royalty on patents and another on Know-How rather than one royalty on the Hooker process. Hooker therefore so changed the wording of the Agreement.

Mr. Gary, counsel for Velsicol in negotiating the Agreement, testified that he intended that the licensing of Know-How cover a process. He testified that this "definition licensing," defining the process to be licensed rather than attempting to list all the pertinent patents, is common in industries where there are many patents involved because it is difficult to keep all patents listed on the license. Here, however, the parties were dealing with very few patents. Moreover, the Agreement provides separately for patent and Know-How royalties, and it expressly provides for the listing of patents.

The record also shows that the claims of the patent listed (McBee-Devaney) and the contemplated claims of the patent to be listed (Maude-Rosenberg improvement) together covered the process. Therefore it would have been rather redundant to provide for payment of one royalty on the patents and another on the process, though it is true, as Velsicol points out, that the process could possibly be used by one operating outside the patent claims.

Moreover, the record in this case indicates that it would at least be *possible* for Velsicol to use a substantial amount of the information imparted by Hooker and yet not use the Hooker process. And it would have made no sense for Hooker to have, on the one hand, agreed to furnish information and then, at the same time, to have allowed Velsicol to avoid payment of royalty on this information by not using the Hooker process. There is no reason to believe that the parties intended that the information be a gift to Velsicol even though Velsicol was not using its process.

### Know-How Issues

We have determined that the Agreement licenses and provides for payment of royalty on use of information. It would be well, now, to define the remaining Know-How issues generally.

The first issue is: what information is "Know-How of Hooker" for purposes of this action? Answering this question requires answering two subsidiary questions. The first is: what kind of information is Know-How generally? The second is: upon what "Know-How of Hooker" may Hooker rely in asserting its royalty claim, in view of the terms of the Agreement, the facts developed at the trial, the narrowing of the issues by order of the Court, and the law generally?

The second issue is: what are the general considerations in determining how much of this "Know-How of Hooker" has been used by Velsicol?

The third issue is: what amount of "Know-How of Hooker" used by Velsicol will require the payment of royalties thereon?

We propose to discuss these general Know-How issues in turn and then, having so developed the applicable principles and general considerations, apply these to the proof in determining whether Velsicol is liable to Hooker for payment of Know-How royalty.

### What Information is "Know-How of Hooker" for Purposes of this Action?

"Know-How" is generally defined in Mycalex Corporation of America v. Pemco Corporation, D.C., 64 F.Supp. 420 at page 425 as follows:

"* * * factual knowledge not capable of precise, separate description but which, when used in an accumulated form, after being acquired as the result of trial and error, gives to the one acquiring it an ability to produce something which he otherwise would not have known how to produce with the same accuracy or precision found necessary for commercial success. * * *"

We consider this to be a correct definition of Know-How.

In its pre-trial memorandum, Hooker inserted (pp. 69 through 75) an exhibit setting out "Some Examples of Velsicol's Use of Know-How of Hooker." At a pre-trial conference held for the purpose of narrowing the issues, the Court required Hooker to furnish Velsicol a list of any additional items of Know-How that Hooker contended that Velsicol is using and, if any further Know-How was discovered by Hooker upon which it intended to rely, required Hooker to so advise Velsicol immediately. Hooker, pursuant to this order, did furnish Velsicol with an additional list of items of Know-How and further was allowed to add one item during the trial. Accordingly, Hooker is limited to the Know-How items set out in the exhibit to the pre-trial memorandum, plus the items on the list furnished to Velsicol following the pre-trial conference (the foregoing items being combined in one list by Velsicol and filed as Exhibit DX 296), plus the item specifically added during the trial.

Velsicol points out correctly that, by definition, Know-How is limited to information that *could* be used in the Hooker process. We doubt, however, that this limitation would actually exclude any information claimed by Hooker to constitute Know-How. This is true because all such information could be used in the Hooker process.

Hooker contends that it may treat as Know-How any technical information so long as it was not known to Velsicol. Velsicol contends that technical information cannot be treated as Know-How, even though not known to it, if it was published or generally known to those practiced in the art and particularly if it constituted standard practice. In making this argument, Velsicol relies in part on particular provisions in the Agreement and in part on the applicable law in this field.

One of these provisions in the Agreement reads as follows:

"Article 4—Disclosure by HOOKER.

"(A) HOOKER shall disclose to VELSICOL all Know-How of HOOKER. Any and all technical information so disclosed to VELSICOL shall at all times remain the property of HOOKER and VELSICOL shall treat as confidential all such information and shall not divulge any such information to others, except to the extent necessary for the operations of VELSICOL hereunder, without the written consent of HOOKER so long as such information shall not be published."

Velsicol argues that because the Know-How imparted was to remain the property of Hooker, Know-How is by the Agreement limited to information in which one can have a property right. It then argues that one can have a property right only in a trade secret and cannot have a property right in information which is published or which is known generally to those skilled in the art, citing cases. Therefore, Velsicol argues, the agreement excludes from Know-How all information which was published or known generally to those skilled in the art.

We would, absent another consideration, be inclined to construe this provision—that the Know-How is to remain the property of Hooker—as meaning only that Velsicol was prohibited from disclosing any such information to another

and not to construct it as having the effect of relieving Velsicol of liability for royalty for using such information as is not the "property" of Hooker. This other consideration is the fact that, unless we give this provision the effect of relieving Velsicol of the obligation to pay royalty on information that is not a trade secret of Hooker, it appears that the Agreement in this respect would be void as against public policy.

The Court of Appeals for the Sixth Circuit seems to so hold in Reynolds Metals Co. v. Skinner, 166 F.2d 66 (1948), cert. denied 334 U.S. 858, 68 S.Ct. 1528, 92 L.Ed. 1778 (1948). In that case the plaintiffs entered into an agreement with the defendant's assignor providing for the employment of plaintiffs and the assignment of plaintiffs' patents concerning the extrusion of metals, with royalties to be based on the licensee's sales. The licensee could terminate the agreement after notice, but was then required to discontinue the extrusion of metal under and by means of the "processes, patents and devices" of the plaintiffs. The plaintiffs supervised the installation of a plant for the defendant and, in addition to installing the equipment covered by their patents, introduced some unpatented devices. The defendant subsequently terminated the agreement, but continued to operate the plant after making certain equipment changes. The plaintiffs brought suit for royalties claiming, *inter alia*, that the defendant continued to use a number of unpatented processes or devices disclosed by the plaintiffs and that they were entitled to compensation for such use.

On this point the trial court held in favor of the plaintiffs, but the Court of Appeals modified this ruling, stating:

"Men who have knowledge of a certain art cannot collect royalty for the use of unpatented devices known to and used in the trade merely because of their know-how. They must have conceived, invented or developed the devices or processes in order to be entitled to compensation for their use. Otherwise the

monopoly of the patent law would be extended with disastrous effect. As we construe it, the contract in this immediate provision does not cover any tools, methods or processes which * * * [plaintiffs] * * * did not originate or so substantially improve that they became invested with their ownership. Otherwise construed, we think the contract would be void as against public policy."

■■ The holding in the foregoing case, together with the holding in A. O. Smith Corp. v. Petroleum Iron Works Co., 73 F.2d 531 (C.A.6, 1934), indicate that a party may not license and collect royalty on technical information or a process or the like, unless it constitutes a discovery by the licensor which has been withheld from the public domain. It does not have to be, these cases made clear, a patentable invention, but it must have the requisites we have just set out. It would therefore appear to matter not whether we construe this Agreement as having this effect, or whether we construe it as Hooker advocates we should construe it and then hold that the Agreement in this respect is void as against public policy.

Velsicol argues that there is another reason why technical information which had been published or had become generally known in the industry cannot be relied upon by Hooker. Here Velsicol asserts the benefit of the more favored licensee provision in its Agreement with Hooker coupled with an agreement Hooker subsequently made with Shell Development Company. As will be seen, we uphold this Velsicol contention, and therefore this is an alternative basis for so limiting the information upon which Hooker may rely.

The more favored licensee provision in the Hooker-Velsicol Agreement reads as follows:

"Article 8—*No other License—Favored Licenses*

"HOOKER warrants there is no outstanding license by it under the Licensed Patent Rights. HOOKER

agrees that if it shall enter into an agreement under the Licensed Patent Rights to use the inventions therein described and claimed or to use the Know-How of HOOKER on more favorable terms and conditions than those herein specified, then and thereafter VELSICOL shall, under substantially similar conditions, have the benefit of such more favorable terms and conditions."

It appears that Shell became interested in obtaining a license on the Hooker process to make hex in Holland and, therefore, in August, 1953, to enable Shell to determine finally whether it would negotiate such a license, Hooker agreed to furnish Shell technical information concerning its process. The agreement between Hooker and Shell, setting out the conditions under which the information would be furnished, is contained in a letter from Shell to Hooker, which reads in pertinent part as follows:

"We [Shell] have been discussing with you [Hooker] the basis upon which we may obtain on behalf of our affiliated company, Bataafsche Petroleum Maatschappij, technical information relating to your process for the production of hexachlorocyclopentadiene. Our associated company is interested in this process for its possible utilization in a plant to be constructed in The Netherlands. The following sets forth the basis upon which such technical information will be made available to us.

"1. 'Confidential Information' as used herein shall mean technical information relating to such process and disclosed or confirmed to us by you in writing or by drawings, which information is not already in our possession prior to such disclosure and which is not and does not become a part of the public knowledge or literature and is not hereafter acquired by us from a third party.

"2. We agree not to divulge any confidential information in whole or in part to any third party and not to make any commercial use thereof without your written consent. This agreement on our part shall continue for so long as such information remains confidential, as a matter of fact.

\* \* \* \* \* "

Pursuant to this letter agreement, Hooker made a complete revelation of the technical information covering its process for making hex, even allowing Shell technical personnel to visit and study its plant at Niagara Falls. Shell, however, chose not to take a Hooker license and later built a plant in Holland embodying the Hyman thermal (sometimes called the Lidov) process.

That process starts with cyclopentadiene ("cyclo"), which is chlorinated in liquid phase to tetrachlorocyclopentane, which is then chlorinated in a second liquid-phase step to octachlorocyclopentene ("octa"). These liquid-phase chlorinations do not make use of photochemical (i. e., ultra-violet light as a catalyst) chlorination. It then cracks or dechlorinates the octa to hex in vapor phase in a nickel or nickel-alloy tube reactor. It will be seen that this process is similar to the Velsicol first and second step liquid-phase chlorinations, except that it chlorinates further in the second step. It will also be seen that the third step, in vapor-phase, is similar to the Hooker and Velsicol third steps insofar as they crack octa to hex.

Velsicol contends, as stated, that it is entitled to the more favorable terms with respect to Know-How which are contained in the agreement between Hooker and Shell. Under this agreement, Velsicol points out, Shell may make commercial use of all technical information furnished to it except information defined therein as "confidential." Velsicol further points out that all technical information that is a part of public knowledge or literature is excluded from "confidential" information. Velsicol still further points out that Shell, having this information, has built and is operating a hex plant using a process similar to Velsicol's and, argues

Velsicol, even if Shell is not actually using this information which is not "confidential" under its agreement with Hooker, it has a right to use it for commercial purposes and without limitation, which is sufficient to enable Velsicol to invoke the more favored licensee provision, citing Guggenheim v. Kirchofer, 66 F. 755 (C.A. 2, 1895), Cold Metal Process Co. v. McLouth Steel Corp., 170 F.2d 369 (C.A.6, 1948), and 69 C.J.S. Patents § 263.

Hooker replies that the more favored licensee provision cannot here be invoked by Velsicol because Hooker has not given consent to Shell to make use of the information imparted to it and because it has not given what technically may be called a license to use the information and because the conditions under which it imparted the information to Shell are not substantially similar to those under which it imparted the information to Velsicol. Hooker, however, in making this first argument, fails to recognize that under its agreement with Shell, Shell is entitled without Hooker's consent to use the Know-How, even for commercial purposes, unless the Know-How is covered by the definition of "confidential information" contained in the agreement. Velsicol is here only seeking for the same right to use, without paying royalty, Hooker information which is not "confidential" in that it is a part of public knowledge or literature. Next, while it is true that Hooker has not granted to Shell a license in the technical sense to make hex using the Hooker process, Article 8 of the Hooker-Velsicol Agreement, upon which Velsicol here relies, does not require, before it can be invoked, that the agreement between Hooker and a third party be a license. While the parties to this action have generally referred to Article 8 as a "more favored licensee" provision, this does not control the proper interpretation of this Article. It is true that the caption of Article 8 includes the words "Favored Licensee." But the Article specifically provides "Hooker agrees that if it shall enter into *an agreement* * * * to use the 'Know-How of Hooker' on more favorable terms than those herein specified.

* * *" Finally, the words in Article 8 " * * * under substantially similar conditions * * *" do not, as Hooker contends, describe the conditions under which Article 8 may be invoked but rather describe the rights of Velsicol after it has a right to invoke the provisions of that Article.

It is true, as Hooker points out, that Hooker received the consent of Velsicol before entering into these negotiations with Shell (Velsicol's license, for a limited time, having been an exclusive license), but there is no indication that Velsicol thereby waived any rights it had under the more favored licensee provision.

For the reasons indicated, we are of the opinion that information which was generally known to those practiced in the art or published in the literature, at least at the time the information was received by Velsicol, cannot be relied upon by Hooker.

Velsicol also contends that technical information communicated to it by Hooker not pursuant to the Agreement cannot be relied upon by Hooker. This contention includes information communicated prior to the execution of the Agreement, and it also includes information communicated after execution of the Agreement provided it was communicated pursuant to the supplier-customer relation of the parties. Hooker does not appear to take issue with this contention except that Hooker contends that information which was communicated prior to execution of the Agreement, but in anticipation of the Agreement, can be relied upon by it. The only Know-How communicated prior to this Agreement with respect to which this distinction would be important is the report dated December 8, 1950, by Maude and Rosenberg entitled "Hexachlorocyclopentadiene by Catalytic Thermal Chlorination." Velsicol contends that this document was handed by Hooker's Mr. Sconce to Velsicol's Mr. Wilks when the latter visited the Hooker Niagara Falls pilot plant on December 14, 1950. If this were the fact, the delivery was made before the parties had entered into license negotiations. Hooker contends, however,

which we find to be the fact, that the document was mailed to Velsicol about March 21, 1951, which was before the Agreement was actually signed but after the effective date of the Agreement. Accordingly, it is clear that the information contained in this document was communicated pursuant to the Agreement.

■ Before passing to the next major Know-How issue, it should be pointed out that Velsicol contends, and Hooker does not insist to the contrary, that Know-How that Velsicol already had when communicated by Hooker may not be relied upon by Hooker in support of its royalty claim.

General Considerations in Determining

How Much "Know-How of Hooker" is Velsicol Using

In their argument as to whether Velsicol is using a substantial amount of Hooker Know-How, Hooker, much more than does Velsicol, paints the picture with broad strokes. In doing so, Hooker adopts what might be called a wrongful evasion or guilty mind theory of Velsicol's conduct. It argues that Velsicol intended, at least when it decided in September, 1959, to devise a process for making hex by direct chlorination with cyclo as the starting material, to attempt to skirt Know-How and patent royalty liability under its Agreement with Hooker. As an indication of a motive to wrongfully evade Know-How royalty, Hooker points out that Velsicol decided to call this project the "PCL Project," to avoid references to "C56," the Hooker trade name, in referring to the project, and to keep the project a secret from Hooker.

Hooker also points to the fact that Velsicol showed unusual and complete confidence in its ability to develop, and that it did develop, a process by June 30, 1960, in time to give notice of the hex purchase contract cancellation and to be in production by early 1961. Thus, argues Hooker, Velsicol anticipated relying on and must in fact have relied on Hooker Know-How. Hooker also points to the fact that, at least initially, Velsicol assumed it would have both a

patent and a Know-How royalty obligation to Hooker, that this assumption was changed later to include only a lesser royalty (it is not clear how much), and that it was not until March, 1951, that Velsicol, on advice of counsel, determined that it would owe no royalty on its process. Hooker also points to the fact that Velsicol employed Meissner Engineers to design its new plant and that Mr. Kronseder, who recently had worked for Velsicol and who had received information on the Hooker process, had become employed by Meissner and was in charge of the design project for that firm.

In response to the Hooker wrongful evasion theory, Velsicol points out that it was highly important for it temporarily to keep its project to make pure grade hex secret from Hooker, for Hooker was its life line for that product. But Velsicol does not explain why the secrecy of such an intention was considered so important in 1959–1960 but was not important to it when it considered making pure grade hex in 1957–1958. We think a more real difficulty in accepting Hooker's theory that Velsicol intended, beginning in September, 1959, to use Hooker patents and Know-How and to wrongfully evade royalty payments, is that Velsicol could well have laid down no tracks and yet it did lay down some. It could have left out royalty provisions in its cost projections from the beginning and, moreover, Velsicol did not have to put in writing in committee minutes its decisions to substitute "PCL" for "C56" and to keep the project secret.

With respect to its confidence in its ability to develop and its development of a process within the time available to it, Velsicol validly points to its own experience in hex chemistry, to the expert proof it offered that the time consumed was not unusually short to accomplish the task at hand, that it actually did not begin to order plant equipment until it had worked out its process in the laboratory and the pilot plant, and that it had many "bugs" to eradicate from its process and plant after it got into production. With respect to its initial assumption that it

would owe a royalty to Hooker, Velsicol validly points out that it did not then know exactly what its process would ultimately be and that those who made the assumption were not lawyers and were making a conservative assumption in presenting cost projections to the Velsicol board. With respect to its employment of Meissner Engineers and Mr. Kronseder's former connection with Velsicol and receipt of Hooker information, Velsicol points out correctly that Kronseder certainly did not leave Velsicol to be available at Meissner to head up this plant design project, that there were plenty of people at Velsicol who had Hooker information and who could have made it available to any design engineering firm Velsicol chose to employ, and that a great part of the design of the plant can actually be traced to Velsicol's laboratory and pilot plant work plus original calculations made at Meissner.

This circumstantial evidence relied upon by Hooker would, in spite of Velsicol's explanations, be rather persuasive if one did not take the trouble to analyze each item of Know-How to determine to what extent Hooker may rely thereon and then to try to trace that on which Hooker may so rely into the Velsicol process and plant.

██ Hooker argues that, with respect to its conceded burden of showing a causal relation between what it imparted to Velsicol and what Velsicol is doing, this Court *must* infer that there is such a cause-and-effect relation if it is shown that certain information was furnished and that the Velsicol process or plant made use of the conception so imparted. We agree that we may reasonably, as the trier of the fact, make that inference, but we may also reasonably not make that inference, e. g., where it is shown that what Velsicol is doing can be traced to experimentation and design work carried out by Velsicol and its engineers for use in the Velsicol process. We are not, in short, required to make that inference, and Grepke v. General Electric Co., 280 F.2d 508 (C.A.7, 1960), relied upon by Hooker, does not so hold.

### How Much Know-How Must Be Used to Create Royalty Liability?

We come now to the last general Know-How issue, and that is: how much Know-How must Velsicol use to incur liability for royalty.

As stated, it is Velsicol's basic position that it is in no event liable for Know-How royalty unless it is using Know-How in making hex by the Hooker process, and we have already ruled against this contention. Velsicol then argues that, because the definition of Know-How in the agreement begins "The term 'Know-How of Hooker,' as used herein, means *all* technical information necessary to design * * *," and because the royalty provision creates an obligation to pay royalty on hex made " * * * using the Know-How of Hooker * * *," it is obligated to pay royalty if, and only if, it is using in its process *all* the technical information furnished to it to enable it to make hex by the Hooker process. We do not, however, believe that that is a reasonable interpretation of the agreement, for it would be patently absurd to conclude that the parties intended, when they executed the Agreement, that Velsicol could avoid royalty merely by not using some item of Know-How.

On the other hand, it also was obviously contemplated by the parties, at the time they executed the Agreement, that Velsicol would immediately proceed to construct a plant using the Hooker process. It is true that the Agreement puts no limit on when Velsicol must construct the plant and get into operation, but it will be remembered that this licensing Agreement was entered into only after Hooker advised Velsicol that it was not willing to create the capacity to meet Velsicol's urgent demand for large amounts of hex. In short, what did happen—the building of a plant by Velsicol nine years later using a different process—was not in the contemplation of the parties in 1951 when they executed the license.

██ It thus becomes the not unusual task of a Court to "construe" the Agreement in applying it to this unforeseen contingency. This involves reading into

the Agreement, after considering the terms of the Agreement and the surrounding facts and circumstances, what the parties would have said if this unforeseen contingency had been specifically under consideration at the time they executed it. See, for example: Baldwin Rubber Co. v. Paine and Williams Co., 107 F.2d 350, 353 (C.A.6, 1939); 3A Corbin on Contracts, Sec. 622; and 17A C.J.S. Contracts § 328. Certainly in view of the fact that the Know-How royalty is double the patent rights royalty, the parties would not have expected that a Know-How royalty be paid for the use of an insignificant amount of Know-How. It is our conclusion, therefore, that Velsicol is liable to Hooker for Know-How royalty if it is using technical information imparted to it by Hooker which qualifies, under standards herein outlined, as "Know-How of Hooker" and if that information has significantly contributed to the Velsicol process or plant.

Velsicol is Not Using Know-How of Hooker Which Significantly Contributes To Its Process or Plant

Velsicol, in defending against the claim for Know-How royalty, concedes that Hooker performed its obligation to make available all technical information necessary to design and operate a plant to make hex by the Hooker process. Velsicol contends, however, in making its defense, that it simply is not using any—or in any event not a significant amount—of information upon which Hooker may rely.

In general support of its position, Velsicol points out that in 1960–1961, Hooker decided to develop a process for making hex using either dicyclopentadiene or cyclo as starting materials. (Dicyclopentadiene is simply two cyclo molecules joined together or polymerized. Velsicol first depolymerizes dicyclo and then, of course, uses cyclo as the starting material.) Velsicol points out correctly that Hooker, using its own Know-How, found it necessary to perform a great deal of laboratory work to develop a process, which Hooker believed to be "workable" but not "economically attractive." Velsicol further points out correctly that in developing this process Hooker ignored much of the Know-How it is here claiming Velsicol is using.

In its approach to this problem, Velsicol takes the various Know-How points relied upon by Hooker—in its pre-trial brief, plus the additional list, plus the one point added at the trial—and applies these tests:

1. Was this particular information communicated?
2. Was it communicated to Velsicol pursuant to the license Agreement?
3. Does the difference between the Hooker and Velsicol processes make the information valueless to Velsicol?
4. Was the information well known to those practiced in the art or was it published and generally available?
5. Did Velsicol already know and use the information before it was communicated by Hooker?
6. Was the facet of the Velsicol process or plant allegedly using "Know-How of Hooker" developed by Velsicol experimentation or by Velsicol's independent engineers?

The list comprising all of these Know-How items contains thirty-nine items. A full discussion of each of these items would require as much space as this opinion has to this point consumed. Accordingly, we will simply make a general finding and then discuss in particular only those items which appear to the Court to merit such treatment. Even as to those items, we can only touch some of the high points.

■ It is the general finding of the Court that Velsicol is not using "Know-How of Hooker," upon which Hooker is entitled to rely, which significantly contributed to the Velsicol hex process and plant.

Hooker and Velsicol both use chlorine which is "dry" and is purified. But the chlorine Velsicol uses is produced by it

and has been produced by it for years at its Memphis chlorine plant from cells licensed to it by Hooker. This is the same dry chlorine Velsicol sells in the market and ships in tank cars. If chlorine is not "dry", i. e. free of water, it is corrosive and difficult to store.

Both Hooker and Velsicol, in operating their systems, turn the chlorine on first and turn it off last. But, because of the difference in the processes, this is done for different reasons. If Velsicol introduced its starting material, cyclo, into the reactor without chlorine, it would polymerize and foul the process. If Hooker introduced its starting material, pentane, into the reactor without chlorine, the pentane, which will not polymerize, would darken and prevent photochemical chlorination. Turning chlorine on first and off last would be recognized by any experienced engineer as proper practice in chlorination processes such as these.

Both Velsicol and Hooker take steps to insure that the pentane or cyclo feeds are not contaminated with iron. They do not use the same devices to accomplish this result. The importance of avoiding iron contamination was known to Velsicol through its experience at its Marshall plant and reaffirmed, by trial and error, by its pilot plant experienced in preparing for its Memphis hex plant.

Both Velsicol and Hooker use automatic cut-offs on their hydrocarbon (i. e. pentane or cyclo) feed lines. But Hooker's is activated by a failure in the ultra-violet light since pentane and chlorine become explosive in the absence of light. Velsicol's is activated by a failure in the chlorine feed because cyclo will polymerize in the absence of chlorine. Thus Hooker uses an automatic cut-off to prevent an explosion, a problem Velsicol does not have, and Velsicol uses one to prevent polymerization, a problem Hooker does not have.

Hooker contends that a point of Know-How being used by Velsicol is that chlorine gas and the hydrocarbon feed should be put into the preliminary chlorination zone at points removed from each other and thereby dissolved in the liquid before they mix, because if they mix "in a gaseous phase," a burning will occur creating undesirable materials. At the outset, it should be pointed out that while Hooker introduces pentane as a gas, Velsicol introduces cyclo as a liquid, so that it would be impossible for the chlorine and the cyclo to mix "in a gaseous phase" in the Velsicol process. In the Hooker process, substantially all of the chlorine is introduced in the photochemical chlorinator while in the Velsicol process the chlorine is first introduced in the PCL 2 reactor (the excess not consumed there being transferred and used in the PCL 1 reactor) and additional chlorine is introduced at the vaporizer. Velsicol introduces liquid cyclo into a line recirculating reaction materials for reasons peculiar to the Velsicol process. The importance of introducing the reacting materials at points removed from each other was stressed in a Hooker document given to Velsicol in 1948.

Both Velsicol and Hooker introduce an amount of chlorine in excess of that theoretically required to make hex. The wisdom of this practice is stressed in a paper given to Velsicol and was also described to Wilks and MacMullin at the same time they were taken through the Hooker pilot plant in December, 1950, before negotiations for the license had even begun. Moreover, where it is desired to replace hydrogen with chlorine atoms, this practice is taught in freshman chemistry classes and was certainly known to Velsicol.

In its pre-trial memorandum and at the trial, Hooker gave a great deal of emphasis to the fact that it had advised Velsicol that the PCP produced in the liquid-phase in the Hooker process should reach a specific gravity of 1.67 and that it is the aim of Velsicol, in its process, that PCL 2 have a specific gravity of about 1.67. That would appear, at least ostensibly, to be a clear case of scientific plagiarism. But an analysis of the proof shows, as Velsicol points out, that the Hooker contention is hopelessly confused and is not supportable.

Mr. O'Leary, for Hooker, testified that the specific gravity in and of itself was not important; what is important, he testified, is that this specific gravity indicates a ratio of chlorine to hydrogen in the Hooker PCP of 3:2. (Hooker does not claim, as Know-How given to Velsicol, that a ratio of chlorine to hydrogen of 3:2 at this stage is important.) When it was pointed out to the witness that Velsicol would not have known, from knowledge of the specific gravity of Hooker PCP, that the ratio of 3:2 was important, the witness then testified that actually the important consideration is having an average of 7.2 chlorine atoms in each molecule, which he had told Velsicol. When it was pointed out that Velsicol PCL 2 had an average of only 6 chlorine atoms, he again took the position that the 3:2 ratio was, after all, essential, but he could not say how Velsicol would have known this from the knowledge that Hooker's PCP had a specific gravity of 1.67.

Mr. Sconce, for Hooker, testified that the 3:2 ratio and the specific gravity were both important because they are related to heat of reaction of polychloro compounds, though he never made it clear exactly how the heat of reaction was the key to success in both processes.

It is difficult to see, in any event, why the ratio of chlorine to hydrogen is all-important. As Velsicol points out, even if the beginning hydrocarbon is chlorinated in the liquid-phase to octa, eliminating all hydrogen, as in the Lidov process, hex can then be made by cracking octa to hex. Both Hooker and Velsicol crack some octa to hex in their high-temperature tube reactors. Moreover, while it is true that the ratio of chlorine to hydrogen is 3:2 in the Hooker PCP going into its cat chlorinator and frequently, though not necessarily, in the Velsicol PCL 2 going into its hot tubes reactor, the ratio of chlorine to hydrogen is 4:1 in the PCP going into the Hooker hot tubes reactor, which is mechanically more comparable to the above-mentioned Velsicol reactor—the only reactor in the Velsicol high-temperature zone.

Actually, the specific gravity of Velsicol's PCL 2 is maintained at a minimum of 1.67 and much of the time is substantially greater. It is interesting to note that the witness Sconce, in running his experiment in preparation for the trial to determine whether the Velsicol hot tubes reactor was catalyzing octa to hex, prepared PCL 2 feed material of specific gravity considerably below 1.67. Moreover, when Hooker was experimenting in 1962 with dicyclo and cyclo as starting materials, it chlorinated in the liquid phase to specific gravities as low as 1.5747 and 1.60, indicating that it did not consider a specific gravity of about 1.67 to be crucial in its attempt to develop a process using dicyclo or cycol as starting materials.

Hooker claims that the concept of the two-stage, liquid-phase chlorination used by Velsicol came from Hooker. It is undisputed, however, that Hooker did not, even in its new plant shown to Velsicol around 1957, make use of this concept. (Hooker does not claim that its after-chlorinator, heretofore referred to, embodies this concept.) The most that can be said for the Hooker position is that, when the first Velsicol plant was being designed by MacMullin around 1951, that firm suggested to Hooker, in the course of obtaining information from Hooker, that two-stage liquid phase chlorination might be preferable and Hooker did some experiments based on this concept and reported the results to MacMullin. But the proof is clear that Velsicol developed its two stage process in the laboratory in 1959 after first attempting to accomplish its purpose in one stage.

Hooker contends that the PCP (in Velsicol's process, PCCP or PCL 2) must be vaporized at 325 degrees C and that this is an item of Hooker Know-How used by Velsicol. The proof shows, however, that Velsicol actually vaporizes at about 288 degrees C. Hooker also contends that, as a point of Know-How, the vaporizer should be heated by an externally heated fluid and that the vaporizer should be designed to insure minimum hold-up of liquid to prevent tar formation. The

'fact is that the Hooker vaporizer is of shell-and-tube construction with a bundle of tubes inside a shell with the heating medium inside the shell and around the tubes. (This unit is not to be confused with Hooker's hot tubes reactor.) It is heated by an externally heated hot liquid salt mixture. The Velsicol vaporizer is of double-pipe design, with a smaller pipe inside a larger one, the heating medium being in the larger pipe and around the smaller one. It is heated by an externally heated hot Dowtherm fluid. The Hooker vaporizer actually appears to have nooks and crannies which might well cause liquid hold-up while the Velsicol vaporizer does not. Velsicol had used vaporizers heated by externally heated fluid prior to its designing this one.

Hooker claims as Know-How that the PCP or PCCP and chlorine mixture from the vaporizer should then flow into numerous parallel and separate tubes in a high-temperature zone. Many tubes should be used to provide adequate heating surfaces in the forepart and, after the heat of reaction is created, an adequate cooling surface.

At this point it would be well, again, to compare the Hooker process subsequent to the vaporization of PCP produced in liquid phase with the Velsicol process subsequent to the vaporization of PCCP (PCL 2) produced in the liquid phase. Hooker passes the vapors with chlorine first into the cat chlorinator where about 90% of Hooker's hex is actually made. However, the effluent from this cat chlorinator contains a substantial amount of octa, and in the second stage of the Hooker high-temperature zone, its hot tubes reactor, the purpose is primarily, if not only, to crack or dechlorinate this octa to hex. Velsicol, on the other hand, does not pass the vapors first through a cat chlorinator; it passes the vapors with chlorine directly to the only stage in its high-temperature zone, its hot tubes reactor or "H–10 unit" or "cigar." This vaporized PCL 2 contains mostly hexachlorocyclopentane, and a reaction to make hex requires, as to this component, only the elimination of four hydrogen atoms and the reintroduction of two double bonds. However, the vaporized PCL 2 does contain some underchlorinated materials, which must be further chlorinated to make hex, and considerable octa, which must, as in the case of Hooker at this point, be dechlorinated and be given a second double bond to make hex. It will be seen, therefore, that there is a considerable difference between the Hooker and Velsicol processes in the high-temperature zones and further that the primary function of the Hooker hot tubes reactor is to crack octa to hex while the primary function of the Velsicol hot tubes reactor is the removal of hydrogen from hexachlorocyclopentane.

This general type of reactor, a shell-and-tube heat exchanger, here used by both parties, is a common type used in chemical engineering and is the obvious answer to the needs of Velsicol in its high-temperature zone. There are some differences in the Hooker and Velsicol units, and the particular characteristics of the Velsicol H–10 unit can be traced directly to design calculations made by Meissner Engineers. Moreover, while both units make use of "Inconel" tubes (an International Nickel nickel-alloy product), this product is frequently used, and has been used by Velsicol, in high-temperature corrosive processes.

A retention time of about one second, used by Velsicol in its hot tubes reactor, is claimed by Hooker to be based on its Know-How. It is, however, not clear that Hooker ever communicated the information that this should be the retention time, and even if it did, because of the differences in the function of the two hot tubes reactor units, it does not appear that this information would have been of value to Velsicol. In any event, Velsicol's retention time can be traced to its own experimentation in the development of its process and in the designing of its plant.

Hooker claims as Know-How used by Velsicol the information that temperatures in the hot tubes, high-temperature reactor may range from 300 degrees to

434

600 degrees C. Actually, it advised Velsicol that the temperature in Hooker's hot tubes reactor, its "cracker," should be considerably lower than 600 degrees C. In any event, the function of the Hooker cracker and the function of the Velsicol H–10 unit are considerably different and this difference would seem to have required experimentation by Velsicol to arrive at its desirable temperature. This experimentation was done and the proper temperature established. As a general conception, high-temperature chlorination procedures were discussed in the literature and were known to Velsicol.

Both Hooker and Velsicol quickly quench (i. e. cool) the gaseous effluent, containing mostly hex, from the hot tubes reactors by direct contact with previously cooled and recirculated liquid crude hex. The purpose is to prevent a reverse reaction, i. e. hex to octa. Hooker brings the liquid hex through outlets similar to shower heads into contact with the gases while Velsicol uses an eductor or venturi throat device to bring the liquid hex into contact with the gases. Hooker claims that the necessity of and this method of quick-quench (by direct contact) is Know-How of Hooker used by Velsicol. It appears, however, that the necessity for preventing the reaction from reversing by quick cooling would be seen by any chemical engineer, and this method of accomplishing it—by direct contact—is also an obvious technique to an engineer. The eductor used by Velsicol is a standard unit selected by Meissner Engineers and supplied by Croll-Reynolds Co. Velsicol had had experience in quick-cooling of gases.

Hooker contends, as a point of Know-How, that the use of Inconel tubes in the hot tubes, high-temperatures Velsicol reactor promotes, by the catalytic action of the nickel in the alloy, the cracking of octa to hex. This question of the possible catalytic action of Inconel tubes in this H–10 unit as operated by Velsicol will be discussed more fully in connection with the question whether Velsicol is using the Maude-Rosenberg "nickel" patent as a "Licensed Patent Right." Suffice

it to say here that Velsicol did not expect, when it designed and installed the H–10 unit, to have the problem of cracking octa in that unit (though it has developed that it does have this problem), and that it used Inconel only because of its resistance to corrosion.

The Licensed Patent Rights

As stated, it is the contention of Hooker that Velsicol is using certain Licensed Patent Rights and therefore also owes a patent royalty. These patents are the McBee-Baranauckas "hot tube" patent and the Maude-Rosenberg "nickel" patent. We have heretofore in this opinion, in setting out the background of this controversy, in which we outlined the development of the Hooker process, explained how these patents fit historically into the development of this process. It is the contention of Hooker that Velsicol is using both of these patents in the operation of its H–10 unit, the high-temperature, hot tubes reactor in which Velsicol converts vaporized PCL 2 into hex.

The Maude-Rosenberg "Nickel" Patent

While the Maude-Rosenberg "nickel" patent was not added to the list attached to the license Agreement when the patent was issued in 1956, Velsicol concedes, nevertheless, that it is a "Licensed Patent Right" under the Agreement.

It is the contention of Hooker primarily that Velsicol is using the first claim of the "nickel" patent, which reads:

"1. The improvement in effecting the pyrolytic dechlorination of octachlorocyclopentene to hexachlorocyclopentadiene which comprises contacting the vapors of octachlorocyclopentene with a catalytic surface selected from the group consisting of nickel, cobalt, nickel chloride, cobalt chloride and mixtures thereof in a reaction zone maintained at a temperature between about 400 and about 550 degrees centigrade."

Velsicol concedes, though prior to the trial it questioned, that a substantial amount of octa is being cracked or dechlorinated to hex in its H–10 unit. Velsicol contends, however, that it does

not owe royalty for use of this patent for the following reasons:

1. That it has not been shown that the nickel in the nickel-alloy (Inconel) tubes in its H–10 reactor, as that unit is actually operated by it, acts as a catalyst in promoting the cracking of the octa in the PCL 2 vapor to hex. Velsicol therefore contends that, for this reason, it is not using the Maude-Rosenberg "nickel" patent.

2. That its high-temperature zone is operated at temperatures substantially above and outside those claimed in the patent. Velsicol therefore contends that, for this additional reason, it is not using this patent.

3. That even if the Inconel tubes do have such a catalytic effect, nickel or nickel alloy are the only practicable materials of construction of a reactor for high-temperature chlorination on a commercial scale and as such are well-established in the prior art; therefore, contends Velsicol, it is entitled, even as a licensee, to work within this prior art and owes no patent royalty.

### Does the Nickel in the Inconel Tubes as a Catalyst Aid in Cracking Octa to Hex?

Velsicol concedes, we understand, that it may not, as a licensee, defend against this patent royalty claim on the theory that nickel simply will not as a catalyst aid in cracking octa to hex under the conditions set out in this claim of the patent. This, it would appear, would be an attack on the validity of the patent on the theory that it has no utility, which Velsicol recognizes a licensee generally may not do.

But, argues Velsicol, a given surface may be catalytic when the surface is in one condition and not catalytic when the surface is in another condition, and that this is recognized by claims 14 through 16 of the patent which deal with "re-activating" the "catalytic surface" and keeping it "in an active condition." Moreover, says Velsicol, a surface which is catalytic when contacted with the vapors of pure octa may not be catalytic when the octa is mixed with other compounds and that this is recognized by claims 9 through 13, which specify various octa-containing mixtures upon which the catalytic surface is claimed to operate.

Pursuing this theory of defense, Velsicol contends that Hooker has not carried its burden of proof, and indeed that actually Velsicol has carried a burden it does not have, for three reasons:

1. That the proof does not show that a nickel surface will promote by catalytic action the cracking of octa to hex when the octa is mixed with the other components in PCL 2.

2. That the proof shows that the inside walls of the tubes in the H–10 unit become coated and remain coated with carbonaceous deposits and that therefore, even if the nickel-alloy Inconel tubes would otherwise catalyze the reaction, they are prevented from doing so by this coating.

3. That there is an absolute lack of proof, none being offered, that Inconel, rather than nickel, is a catalytic surface as used by Velsicol.

(Hooker in effect concedes that, in making the three foregoing factual contentions, Velsicol is not attacking the validity of the patent and that these contentions properly go to the question whether Velsicol is using the patent. Hooker introduced a great deal of proof on the first two of these factual issues.)

With respect to the question whether the cracking of the octa contained in PCL 2 vapors is promoted by a catalytic effect resulting from contacting the vapors with a nickel surface, Mr. Sconce for Hooker ran experiments and testified about them and Dr. Kleiman for Velsicol ran experiments and testified about them. Both sought to simulate what Velsicol is doing, although they used clean tubes. Mr. Sconce concluded that the octa will be so catalyzed and Dr. Kleiman concluded that it will not be. Both experts were subjected to rigid and extensive cross-examination aimed at undercutting the validity of their experiments, and Hooker

offered expert proof attacking the validity of the Kleiman experiment and Velsicol offered expert proof attacking the validity of the Sconce experiment. This testimony concerning these experiments consumed many pages in the record, and to describe the marches and counter-marches in this particular battle would consume too much space in this already too-lengthy opinion. Suffice it to say that, taking the most benevolent view of this evidence from the Hooker point of view, it was inconclusive.

In further support of its contention that nickel surfaces will have a catalytic effect in cracking the octa in PCL 2 vapors to hex, Hooker offered the testimony of the co-inventor of the "nickel" patent, Mr. Rosenberg. Mr. Rosenberg testified in substance that laboratory experiments performed by him in 1951 showed that nickel does have a catalytic effect in cracking octa and that this conclusion was confirmed that year in the Hooker pilot plant. It does not affirmatively appear, however, from the contemporaneous records of this laboratory and pilot plant work that nickel was found to have such an effect. Mr. Rosenberg's explanation as to why these records do not more adequately support his testimony was not persuasive. Moreover, Mr. Rosenberg's attempt to support his contention by reliance on the results of Hooker's actual commercial operation also was not persuasive. He contended that his discovery that nickel is a catalyst greatly increased Hooker's output of hex in 1953, but the proof indicates that quite probably this increase was due to the installation of a new cat chlorinator and, perhaps, to improvements in the liquid-phase, photochemical chlorination step. Accordingly, Mr. Rosenberg's testimony, being unconvincing that nickel catalyzes octa in the Hooker process, was unconvincing with respect to the Hooker contention that the cracking of the octa in the Velsicol PCL 2 vapor would be aided by a catalytic effect of nickel.

As was stated, Velsicol also contends that even if its Inconel tubes would otherwise have some catalytic effect in cracking the octa in the PCL 2 vapors, this does not occur under the conditions under which the H–10 unit is actually operated, because the inside wall of the tubes, it is undisputed, become coated and remain coated with a carbonaceous material. In reply, Hooker has, basically, two answers. First, Hooker points out that the tubes are reamed out about every two weeks, which is true, and that in doing so, at least at some points, the bare surface is exposed. However, even if some of the bare surface is exposed, which Velsicol witnesses denied, there was no showing that these small areas were sufficient to catalyze the reaction. Secondly, Hooker points out that the carbonaceous material is shown by chemical analysis to contain a small amount of nickel chloride, but the evidence that such a small amount of nickel chloride could catalyze the reaction was unconvincing. The Maude-Rosenberg "nickel" patent and the Hooker operating manual both teach the importance of keeping the inside tube surfaces clean if the catalytic action is to be preserved. In short, we find that even if the Inconel tubes would otherwise catalyze the reaction, this does not occur at Velsicol due to the carbonaceous deposits which are always present on the tube walls.

█ Velsicol also contends that, even if it has been shown that the cracking of the octa in its PCL 2 vapors would be aided by the catalytic effect of nickel, Hooker still has not shown that Inconel, a nickel alloy, would have such a catalytic effect. Mr. Sconce's experiment, using as a feed material an approximation of PCL 2 prepared by him, used a nickel pipe, not an Inconel pipe. Moreover, Velsicol offered expert testimony that even if it were assumed that nickel would catalyze, this does not mean that Inconel will. It is undisputed that the adverse effect of iron is lost when iron is combined in the alloy Inconel, and, testified the expert, it might well be that nickel would lose any catalytic effect it might have when combined in this alloy. In truth, there is no proof that Inconel will catalyze the reaction. This, then, is an-

other reason why Hooker has not carried its burden of proof on the question whether the H–10 reactor, as operated by Velsicol, is catalyzing the cracking of the octa in the PCL 2 vapors.

### The Temperature Issue on the Use of the "Nickel" Patent

Velsicol advances another non-use defense to liability for royalty for use of the Maude-Rosenberg "nickel" patent. It contends that it is operating so far above and therefore outside the temperature range claimed by the patent that, for this reason alone, it is not using the patent. The patent claims a reaction in a "zone maintained at a temperature between 400 and about 550 degrees centigrade." Inasmuch as a similar issue is presented in connection with the question whether Velsicol is using the McBee-Baranauckas "hot tube" patent, we will defer consideration of this issue here and consider it in that part of this opinion.

### Use of Prior Art in Relation to Use of "Nickel" Patent

As was stated, Velsicol contends that even if it is using the "nickel" patent, it is not, as a licensee, obligated to pay royalty because it is operating wholly within the prior art. This prior art is not embodied in a prior expired patent. More specifically, Velsicol contends: (1) that the fact is that, since before the application for the "nickel" patent, nickel and nickel alloys have been known to be the only practicable materials for construction of high-temperature chlorination reactors; and (2) that, therefore, as a matter of law, it is not, even as a licensee, obligated to pay royalty.

We find the position of Velsicol to be correct as to this factual contention. This finding of fact is based on prior art references and on an explicit recognition of this fact by the Hooker patent department, all prior to the patent application.

As to its legal contention, Velsicol argues that where, as here, a material of construction is known to be the proper and desirable material of construction for a given purpose, one cannot, when discovering an additional desirable effect of the use of that material, preempt the use by obtaining a patent, the claims of which include the use of that material for that purpose. And Velsicol argues that it can defend against this royalty claim on the basis of this prior art in spite of the recognized principle that a licensee cannot attack the validity of a licensed patent.

We are of the opinion that to allow Velsicol to defend against this claim on the basis of this prior art would be to allow Velsicol to attack the validity of the Maude-Rosenberg "nickel" patent. The question therefore is whether a licensee can attack the validity of a licensed patent on the ground of prior art other than prior expired patents. It is well established, of course, that prior expired patents may be relied upon even by a licensee to attack the validity of a patent. Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1949) and Hall Laboratories, Inc. v. National Aluminate Corp., 224 F.2d 303 (C.A.3, 1955). However, the Third Circuit specifically held in the Hall case that a licensee cannot attack the validity of the licensed patent on the basis of prior art other than expired patents. On the other hand, there are also cases that seem to hold that a licensee may attack the validity of a patent by reliance on prior art other than expired patents. See, for example: Casco Products Corp. v. Sinko Tool & Mfg. Co., 116 F.2d 119 (C.A.7, 1940) and Garland v. Remington Arms Co., 137 F.Supp. 622 (S.D.N.Y., 1956). These decisions sometimes speak in terms of, by construction of the claims of the patent, "narrowing" the claims to "naught" rather than in terms of attacking the validity of the patent. Garland v. Remington Arms Co., supra. But we can see no difference between narrowing the claims to zero and attacking their validity.

In view of the fact that we have already concluded that Velsicol for several reasons is not using the Maude-Rosenberg "nickel" patent as it actually operates its hex process and plant, we consider it unnecessary to resolve the difficult legal question whether Velsicol is entitled to

rely on this prior art in attacking the validity of this patent.

### The McBee-Baranauckas "Hot Tube" Patent

It will be remembered that prior to around December, 1950, the entire process used by Hooker for making hex involved only two steps and the use of two patents. First, there was liquid-phase, low-temperature photochemical partial chlorination of peutane to produce PCP (McBee-Devaney patent) followed by, second, vapor-phase, high-temperature further chlorination of PCP in an unobstructed reaction zone, which in practice was carried out by use of a hot tube, to produce hex (McBee-Baranauckas patent). Hooker did not believe that the second step, referred to as the "McBee-Baranauckas process" for making hex, was commercially feasible. It will be further remembered that around December, 1950, Maude and Rosenberg, of the Hooker staff, invented an improvement over the McBee-Baranauckas process which involved substituting therefor two steps: the cat chlorinator reactor packed with a catalyst followed by a hot tubes reactor, both in vapor-phase and at high temperatures. As Hooker, for some reason not explained in the record, did not believe that the hot tube part of the Maude-Rosenberg improvement involved use of the older McBee-Baranauckas patent, it did not procure the right from Purdue to sub-license this patent to Velsicol. Accordingly, it only procured the right to sub-license McBee-Devaney and listed it on the license, and Hooker agreed to add the Maude-Rosenberg cat chlorinator—*cum*—hot tube patent when it was issued. The other Maude-Rosenberg patent referred to in the record, the "nickel" patent in suit here, was issued in 1956. This patent merely claimed that if the hot tubes used in the process were constructed of nickel or nickel alloys, this would have a catalytic effect in cracking octa to hex. Although Hooker obtained the right in 1956 to sub-license the McBee-Baranauckas patent, it was never actually added to the list attached to the license Agreement.

It is Velsicol's factual position that, while it knew of the issuance of and its right to use the "nickel" patent, it was not informed and did not know that Hooker had obtained the right to sub-license the McBee-Baranauckas patent until after this litigation began in the fall of 1961. Velsicol, therefore, at first contended that the McBee-Baranauckas was not a "Licensed Patent Right" under the Agreement, but later it retreated from this position.

Hooker contends that Velsicol is using the McBee-Baranauckas patent in the operation of its H–10 reactor, the reactor the use of which is the basis for Hooker's other claim for the same royalty for use of the "nickel" patent. (Under the Agreement, the royalty is 1 cent per pound whether Velsicol is using one or more patents.) Velsicol's defenses to royalty liability for use of this patent may be outlined as follows:

1. That it is operating its H–10 reactor at a temperature above and outside the range prescribed by the patent claim.

2. That the H–10 reactor is operating within the prior art and that Velsicol is entitled to use the prior art without payment of royalty.

3. That in any event Hooker is barred by estoppel, laches and unclean hands from recovering royalties for use of this patent.

### The Temperature Issue on the McBee-Baranauckas Patent and the Maude-Rosenberg "Nickel" Patent

As heretofore indicated, we will discuss the temperature issues as to both patents together.

Hooker relies primarily on claim 4 of the McBee-Baranauckas patent, which reads as follows:

"4. The method which incudes: reacting, at about atmospheric pressure, a compound selected from the group consisting of chlorinated alicyclic hydrocarbons containing five carbon atoms in the ring of the molecule with chlorine in amount at least that theoretically

required to produce hexachlorocyclopentadiene, in a substantially unobstructed reaction zone maintained at a temperature between about 350 and about 550 degrees centigrade; and, separating hexachlorocyclopentadiene from the reaction product."

It will be remembered that the prescribed temperature in the claims of the Maude-Rosenberg "nickel" patent is between about 400 degrees C and 550 degrees C.

Velsicol concedes that from the beginning of operations in Memphis until January 1, 1963, it was operating its H–10 unit at temperatures under 550 degrees C and therefore it asserts this temperature defense as to both patents only for the period subsequent to that date. It also concedes that the purpose in raising its temperature after January 1, 1963, was to avoid the possibility of its using Hooker patents, although there may have been some other advantages that accrued which were not anticipated.

This H–10 reactor, described generally heretofore, has the overall shape of a cigar. It is a heat exchanger of the shell-and-tube type. It consists of a bundle of over 100 spaced Inconel tubes, arranged parallel to each other, about fifteen feet long, and having an internal diameter of one inch. Around the bundle is a shell. Into this shell and around the outside of the tubes is injected hot combustion gas which heats the tubes and the vapors fed through the tubes. At the inlet end of the unit there is a cone and the PCL 2 vapors are fed into this cone from whence they pass into and through these Inconel tubes. There is also a cone at the outlet end of the tubes, and the gases pass out into this cone and then into a pipe leading to the cooling apparatus. There is a partition at each end of the Inconel tubes through which the tubes protrude. These two partitions allow and require the PCL 2 vapors to pass into the inlet cone, through the tubes, and through the outlet cone, and at the same time prevents the heating gases, which are injected into the shell, from invading the cones.

There is a thermocouple (temperature measuring device) in the inlet cone and another in the outlet cone, and there are, or were originally, fifteen of them scattered at various points between the cones, inside the shell, and attached to tubes. In this way the temperature of the vapors may be measured in the inlet and outlet cones, and the temperature of the outside tube surfaces may also be measured. There are no thermocouples inside the tubes. It is therefore apparent that unless the thermocouples attached to the outside wall surfaces of the tubes accurately measure the temperature of the vapors passing through the tubes, the temperatures of the vapors in the H–10 unit can only be measured in the inlet and outlet cones.

For the period with which we are here concerned, the temperatures recorded and introduced in evidence were taken daily during the period from January 1 to September 15, 1963. This record shows temperatures in the inlet cone, and at No. 6 thermocouple which is about midway between the tube ends, and in the outlet cone. The inlet temperatures range from a low of 245 degrees C to a high of 298 C but are clustered at 286 degrees C. The tube-surface temperatures at No. 6 thermocouple range all the way from a low of 381 degrees C to a high of 648 degrees C and cannot be said to be clustered at any point or even within relatively narrow limits. The outlet temperatures range from a low of 595 degrees C to a high of 698 degrees C and are clustered between 620 degrees C and 648 degrees C.

It is the contention of Hooker that the temperature of the tube surface at No. 6 thermocouple is a fair measure of the highest temperature of reaction in the unit. It is the contention of Velsicol that the temperature of the tube surface is not a fair measure of the highest temperature of reaction and that the temperature in the outlet cone is the fairest measure of this temperature.

It is more probable than not that the reaction proceeding at No. 6 thermo-

couple is exothermic (heat generating), which would mean that the vapor temperatures inside the tube at that point would be higher than the outside tube-surface temperatures at that point. In any event, since the actual temperatures in the inlet and outlet cones are each clustered in a fairly narrow range, we must assume, in the absence of evidence to the contrary, that the actual temperature inside the tubes at thermocouple No. 6 also generally remained within a fairly narrow range. We know, however, that tube-surface temperatures at that point ranged between 381 degrees C and 648 degrees C and are not clustered within a fairly narrow range, and therefore the tube-surface temperatures would not seem to be a reliable measure of the vapor temperatures inside the tube at that point. It is true that there is no explanation in the record as to why the tube-surface temperatures do vary so greatly from day to day, but, as stated, in view of the relative constancy of the inlet vapor temperatures and the outlet vapor temperatures, it would seem that the tube-surface temperatures are not a fair measure of the inside vapor temperatures.

Velsicol argues correctly that, assuming the reaction is not proceeding exothermically in the outlet cone, the temperatures there, which can be accurately measured, must be no higher than the highest temperatures inside the tubes, because the cone is not heated or jacketed; alternatively, if the reaction is proceeding exothermically in the outlet cone, causing the temperatures of the vapors in the cone to be higher than at any point inside the tubes, the cone is an extension of the reaction chamber and the temperature there is therefore the highest temperature of reaction.

We therefore conclude that the temperatures in the reaction zone in the H–10 unit during this period can best be measured by the temperatures in the outlet cone and were within the range between 620 degrees C and 648 degrees C and therefore exceeded the maximum temperature required to be maintained by

both patents (550 degrees C) from 70 degrees to 98 degrees C.

Hooker argues that, even if the temperatures be as this Court has just found them to be, the McBee-Baranauckas and the "nickel" patents are being used because the vapors enter the reactor at about 286 degrees C and therefore pass through the temperature ranges described in the two patents. If this were a valid argument, then use of the patents could not be avoided no matter how high the temperature of the reaction zone was maintained. The claims of both patents refer to a "reaction zone *maintained* at a temperature" between about 350 (McBee-Baranauckas) or 400 (Maude-Rosenberg) degrees C and about 550 degrees C. Thus, it would appear that the question whether Velsicol was using these patents during this period, in spite of the temperature in the reactor being in excess of the maximum allowed to be maintained by the patent claim, turns on construction of the patent claims and the doctrine of equivalents.

The specification of the McBee-Baranauckas patent, with respect to temperature, reads in part as follows:

"We have found that the temperature of the reaction of the polychloro compounds with chlorine in the high-temperature reaction zone is especially critical. The temperature in said zone must be maintained between about 350 degrees and about 550 degrees centigrade, a temperature between about 440 degrees and about 500 degrees centigrade is preferred, and a range between about 460 degrees and about 480 degrees centigrade is particularly desirable."

All of the examples in the specification of the "nickel" patent prescribe a reaction zone temperature of 500 degrees C and the specification further states:

"The upper limit of temperature which can be satisfactorily employed for this reaction is about 550 degrees centigrade, at which temperature degradation of the hexachlorocyclopentadiene becomes significant."

The claim of a patent must be construed, and given effect, in the light of the invention disclosed as shown by the specification. The Maytag Co. v. Murray Corp. of America, 318 F.2d 79, 85 (C.A.6, 1963) citing Blanc v. Curtis, 119 F.2d 395, 397 (C.A.6, 1941).

These patents are, after all, thermal or thermocatalytic process patents, and a reading of these patents, particularly the language in the specifications herein quoted, makes it clear that the temperature of the reaction zones is an integral part of the inventions disclosed and claimed. Here the temperatures in the Velsicol reaction zone have been since January 1, 1963, as we have found, well beyond those prescribed in the claims.

In this situation, Hooker falls back on the doctrine of equivalents, and primarily on the case of Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). Hooker argues that even if the temperature maintained in the reaction zone in the H–10 unit is well above the maximum prescribed in the patent claims and even if the temperature of reaction is a part of the inventions disclosed, Velsicol is still, under the doctrine of equivalents, using the patents. This is true, argues Hooker, because Velsicol otherwise follows the teaching of the patents and gets the same result as that claimed by the patents.

In Graver, the Supreme Court recognized that the doctrine of equivalents applies in favor of a secondary invention as well as a primary or pioneer invention. With respect to the nature of the doctrine, the Court said at page 607 of 339 U.S., at page 856 of 70 S.Ct.:

"But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system."

But it should be pointed out that the Trial Court in Graver had, by applying the doctrine of equivalents, sustained the infringement claim, and the Supreme Court, in affirming the action of the Trial Court, held that the finding of the Trial Court could not be set aside unless clearly erroneous. In so holding, the Court also said that (page 609, page 856 of 70 S.Ct.): "What constitutes equivalency must be determined against the contest of the patent, the prior art, and the particular circumstances of the case."

All the "nickel" patent claims is a process for cracking octa to hex by contacting octa vapors with certain catalytic surfaces in a reaction zone maintained within a specified temperature range.

All the McBee-Baranauckas patent claims is the reaction of chlorine with partially chlorinated hydrocarbons in an unobstructed zone maintained within a specified temperature range to make hex.

In view of the fact that these patents claim a thermal or thermocatalytic process using prescribed temperatures, and in view of the emphasis given to the importance of temperatures in the specifications, indicating that the processes would not work if the prescribed temperatures were not maintained, we do not believe that, under the doctrine of

equivalents, these patents can be extended to cover a reaction at temperatures substantially in excess of those prescribed. As was said by the Court of Appeals for the Sixth Circuit in Lunati et al. v. Barrett, 104 F.2d 313, at page 316 (1939):

> "The claims in suit must be narrowly construed within the principle so often applied in this court that where claims define an element in terms of form, location, or function, thereby creating an express limitation, where that limitation pertains to the inventive step and imports a substantial function which the patentee considered of importance, the court cannot be permitted to say that other forms which the inventor thus declared not equivalent are so to be treated."

Hooker concedes that Velsicol may legitimately seek to avoid use of these patents and that the fact that Velsicol admittedly sought to do so by raising its temperature of operation does not undercut its temperature defense to the use of these patents.

▮ We therefore find that Velsicol has not, because of temperatures maintained in its H–10 unit, used either the "nickel" patent or the McBee-Baranauckas patent since January 1, 1963.

### Does Velsicol Owe Hooker Royalty for Use of the McBee-Baranauckas Patent for the Period Prior to January 1, 1963?

Having upheld certain Velsicol defenses, based on lack of use, to the claim for royalty on the "nickel" patent for the entire period involved, and having upheld the Velsicol defense, based on temperature, for the period after January 1, 1963, to the claim for royalty on both patents, there only remains, on the royalty question, to determine whether Velsicol owes Hooker royalty on the McBee-Baranauckas patent for the period from early 1961, when it was stipulated that production reached a rate of 100,000 pounds per month, to January 1, 1963.

### Prior Art and the McBee-Baranauckas Patent

▮ In making the prior art defense to the royalty for use of the McBee-Baranauckas patent, Velsicol must attack the validity of the claim of the patent because what Velsicol was doing prior to January 1, 1963, in its high-temperature zone, reads squarely on Claim 4 in this patent.

Velsicol contends correctly, as has been seen, that a licensee may attack the validity of the licensed patent on the basis of prior art if the prior art consists of an expired patent. Scott Paper Co. v. Marculus Mfg. Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945) and Hall Laboratories, Inc. v. National Aluminate Corp., 224 F.2d 303 (C.A.3, 1955).

None of the prior art relied upon by Velsicol claims or teaches a process for manufacturing hex by direct chlorination, and it appears that McBee-Baranauckas is the first patent to claim a process for making hex by direct chlorination of a hydrocarbon or of a partially chlorinated derivative of a hydrocarbon.

The principal prior art upon which Velsicol relies is the Hass-McBee expired Patent No. 2,004,072, claim 13 of which reads:

> "The process of chlorinating compounds of the class consisting of hydrocarbons of the paraffin, naphthene, and aromatic series and their partially chlorinated derivatives, which consists in producing a substitution reaction between such material to be chlorinated and chlorine wholly at a temperature between 250 degrees C and 700 degrees C."

It appears that hexachlorocyclopentane (the main ingredient in PCL 2) is a partially chlorinated derivative of a naphthene and, therefore, argues Velsicol, this claim of this expired patent describes what Velsicol does in its high-temperature zone in making hex. This claim, however, specifies a substitution reaction, and it appears that the Velsicol's high-temperature zone does not employ such a reaction. Accordingly, what Velsicol is

doing is not within the claim of the Hass-McBee patent.

The other prior art here relied upon by Velsicol, too copious to describe, consisting of expired patents and other sources, likewise does not anticipate what Velsicol is doing to make hex in its high-temperature zone. We assume, again without deciding, that the prior art other than prior expired patents may be relied upon by Velsicol to attack the validity of the patent.

We therefore find that Velsicol has not sustained its prior art defense to the McBee-Baranauckas patent.

### The Defenses of Laches, Estoppel and Unclean Hands to the Mc-Bee-Baranauckas Royalty

Velsicol advances the defenses of laches, estoppel and unclean hands only as to the claim for royalty for use of the McBee-Baranauckas patent. As will be seen shortly, it is true that its defenses of estoppel and unclean hands are based on the factual predicate of Velsicol's lack of knowledge that Hooker had acquired the right to sub-license the patent to it. But this factual predicate is not necessary to the defense of laches—that is—the defense that Hooker delayed too long in bringing this suit. Accordingly, Velsicol could have just as plausibly asserted the defense of laches to all of Hooker's claims.

With respect to the equitable defense of laches, we assume, without deciding, that this defense is available in a suit to recover money for breach of contract where an accounting is also sought. Hooker, as will be seen, also seeks specific performance of a provision in the license Agreement having to do with making available to it any improvements in the process for making hex in accordance with "Licensed Patent Rights" and therefore, it would appear, this equitable defense would, in any event, be available to Velsicol on that branch of this action. See, generally, 17A C.J.S. Contracts § 531. There was not, however, any unreasonable delay by Hooker in bringing this action. Hooker was not advised until June, 1960, that Velsicol intended to manufacture a pure grade hex and thereafter Hooker took prompt steps to ascertain from Velsicol the details of the process Velsicol intended to use, which Velsicol would not voluntarily divulge. Moreover, Hooker could have no cause of action for royalty until Velsicol began the manufacture of hex in the early part of 1961, and Hooker filed this action in the fall of that year.

As stated, Velsicol originally contended that the McBee-Baranauckas patent was not a "Licensed Patent Right" under the Agreement (in which case the claim of Hooker, together with Purdue, would be for infringement), but later receded from that position. It based that contention and it bases the defenses of estoppel and unclean hands on the factual predicate that this patent was not only not listed after Hooker in 1956 obtained the right to sub-license, but also that Hooker did not advise Velsicol that it had such a right and therefore that Velsicol could not have known and did not know that this patent had become a "Licensed Patent Right" until after this litigation had begun.

 Hooker offered proof that Velsicol was orally advised on more than one occasion between 1956 and September, 1959, when Velsicol began the development of its process, that Hooker had obtained the right to sub-license the McBee-Baranauckas patent. The Velsicol representative who allegedly received this information denied having received it. It is undisputed that no written communication was made. Hooker's proof is based primarily on the memory of one witness concerning his conversations that took place some years ago, and the contemporaneous memoranda of the witness covering these conversations in no way indicate that the right to sub-license McBee-Baranauckas was discussed or even mentioned. We find that Hooker did not so advise Velsicol, and that Velsicol did not ascertain this fact until after this suit was brought.

 With respect to the defense of unclean hands, we again assume, without deciding, that this defense is available to Velsicol in resisting the money claim. There is, however, no showing that Hooker's failure to advise Velsicol that it had obtained the right to sub-license this patent resulted from bad faith or other unconscionable motive. Hooker had nothing to gain by not so advising Velsicol and in fact was making available to Velsicol all information concerning its process. Rather, we believe and so find, this failure to so advise Velsicol resulted from inadvertence coupled with the fact that Hooker still thought, perhaps, that use of the McBee-Baranauckas patent was not necessary to the Hooker process. We therefore do not sustain the defense of unclean hands. See, generally, 69 C.J.S. Patents § 313 at page 901.

 With respect to the defense of equitable estoppel, and again assuming, without deciding, that this defense is available as a defense to the claim for money, we can see no factual basis for asserting this defense. While it can be argued that Hooker was guilty of culpable negligence in not advising Velsicol that it had obtained the right to sub-license the patent, the other elements of estoppel are not present. There is no evidence that Velsicol, in devising its process and in building its hex plant, relied on its belief that McBee-Baranauckas was not a "Licensed Patent Right" under the agreement with Hooker. Moreover, there is no evidence that Velsicol, if it did so rely, relied to its detriment. If Velsicol did use this patent, it either owed a royalty on the patent as a "Licensed Patent Right" or it was an infringer. When Velsicol at first contended that the patent was not a "Licensed Patent Right," Hooker amended, joining Purdue as a party plaintiff, and sued for infringement. When this occurred, Velsicol chose to concede that it was a "Licensed Patent Right" and to defend a royalty claim. There is no detriment here. See, generally, 31 C.J.S. Estoppel § 59.

## Effect on Patent Royalty of More Favored Licensee Provision

We have thus far determined that Velsicol has no defense to the claim for patent royalty for use of McBee-Baranauckas for the period from early 1961 to January 1, 1963. Velsicol contends additionally, invoking the more favored licensee provision of the Agreement (Article 8) heretofore quoted, that an agreement between Hooker and Shell entered into in 1960 provides for a more favored use of the "Licensed Patent Rights." The hex covered by this Hooker-Shell agreement is limited to hex manufactured by the Shell-Lidov process as practiced by the Shell plant at Pernis, Holland. A list of Hooker foreign patents only, covering the manufacture of hex, is attached to the agreement. Hooker agreed not to sue Shell for infringing these foreign patents because of its manufacture of such hex. Shell agreed to pay Hooker one-half cent per pound for such hex both manufactured and sold by it in any country wherein Hooker has these listed foreign patents. Velsicol therefore contends that it, in any event, should not be required to pay more than one-half cent per pound patent royalty on hex produced and sold by it and no royalty on hex produced and consumed by it.

We first must determine whether Shell is a more favored licensee within the meaning of the Hooker-Velsicol Agreement. Hooker argues that Shell is not a licensee in this sense at all because the agreement with Shell only settles a patent controversy. (Velsicol contends that there is no evidence that the Hooker-Shell agreement settled a controversy, but the agreement on its face clearly so implies.) As heretofore indicated in this opinion, Article 8 does not require, before it can be invoked, that the agreement between Hooker and a third party be a license. Moreover, the case of Cold Metal Process Co. v. McLouth Steel Corp., 170 F.2d 396 (C.A.6, 1948) supports Velsicol's contention that an agreement settling an infringement controversy *may* be a license within the meaning of a more favored licensee provision.

Next, Hooker contends that its agreement with Shell is not more favorable than its agreement with Velsicol. It would appear that how favorable this agreement is to Shell would depend to some extent on how good a claim Hooker really had against Shell. This does not appear from the record, but it does appear that there was at least a good faith controversy between these parties. However, the Hooker-Shell agreement does not license Shell to make hex by any process Shell chose to use or by a particular process Shell proposed to undertake; it has the effect of licensing Shell to make hex only by a particular process it was already using in an established plant. Velsicol, on the other hand, could use the "Licensed Patent Rights" in any process it chose to use. Moreover, the Hooker-Shell agreement licenses only foreign patents while the Hooker-Velsicol agreement licenses the use of United States patents. We therefore conclude that this Hooker-Shell agreement is not more favorable to Shell.

Moreover, even if it could be said that the Hooker-Shell agreement is more favorable only because of the more favorable royalty provision, Velsicol could, having the right to invoke the more favored licensee provision, make use of these more favorable terms only under substantially similar conditions. This would require that Velsicol manufacture hex in the foreign countries listed in the Hooker-Shell agreement and under the Shell-Lidov process, which Velsicol is not doing. We therefore conclude that Velsicol is not operating under conditions substantially similar to those under which Shell is operating.

Hooker's Right to Velsicol Improvements

In addition to suing for Know-How royalty and patent royalty, Hooker also seeks to have made available to it all improvements developed by Velsicol for the manufacture of hex. Here Hooker relies upon Article 4(B) of the license agreement, which reads as follows:

"(B) Each party shall make available to the other all information relating to advances and improvements in technology relating to the production of C56 (including by-product recovery) produced in accordance with the Licensed Patent Rights which it may acquire during the life of this agreement. Such information shall at all times remain the property of the party making such information available and the party receiving such information shall treat it as confidential in the manner defined for VELSICOL in Article 4(A) hereof."

Hooker contends that this provision, properly construed, means that it is entitled to information relating to all improvements in making hex developed by Velsicol, even if Velsicol does not use "Licensed Patent Rights," if the improvements relate generally to the Hooker technology in making hex. This construction is contrary to the wording of the provision, for although the provision is not very clear, it is at least plain that it covers only improvements relating to the manufacture of hex in accordance with these patents. Hooker alternatively contends that it is entitled to have Velsicol information relating to the manufacture of hex if Velsicol is using any licensed patent in its process.

Velsicol contends that the provision means that Hooker is entitled only to information on improvements relating to that part of its process in which it is using a Hooker patent. Specifically, Velsicol contends that, even if it is using either the "nickel" patent or the McBee-Baranauckas patent in its high-temperature zone, Hooker is entitled to have information only on Velsicol improvements in the high-temperature zone.

We believe that this provision obligates Velsicol to make available to Hooker all information concerning advances and improvements in technology relating to the production of hex if this technology is used in a process and plant for making hex which also make use of a licensed patent right. On the other hand, we believe that Velsicol is not obligated to make available such technology which has not been actually used in a process and hex

plant which is also using a licensed patent right. It is undisputed—in fact it is Velsicol's theory—that Velsicol has, in devising its process and constructing its plant, made advancements and improvements in the technology of making hex. Moreover, this Court has heretofore found that for a period of approximately two years, terminating on January 1, 1963, Velsicol was using the McBee-Baranauckas patent in its process and plant. It follows that Velsicol is obligated to make available to Hooker all information relating to the Velsicol process and plant to the extent that the information was developed and actually used in the plant prior to January 1, 1963. Hooker is entitled to specific performance of the contract to this extent.

### Velsicol's Counterclaim and Injunctive Relief

Velsicol filed a counterclaim, contending that Hooker had, through an agent employed by it, used improper and tortious methods, including attempted bribery of Velsicol's employees, to learn Velsicol's trade secrets in making hex at Memphis and that Hooker had, by these methods, actually obtained such information. This was alleged to have been done after Velsicol had built its plant at Memphis and before this suit was filed. Velsicol sought an injunction against the use of this information by Hooker. Hooker denied that the agent was employed by it (it developed that he had been employed by Hooker's independent counsel), that the agent had been guilty of any tortious conduct, and that Hooker had learned any of Velsicol's trade secrets.

As stated at the beginning of this opinion, this Court allowed Hooker full discovery as to the Velsicol process and plant. Hooker, of course, during the trial ascertained even more information concerning Velsicol's process and plant. It was clear at the trial that Hooker had learned a great deal more by discovery and by the trial than it could possibly have learned by the allegedly tortious methods upon which Velsicol based its counterclaim. Accordingly, Velsicol did not offer proof in support of its counterclaim. It simply took the position that Hooker was not entitled, under Article 4(B) of the license Agreement, to have any of this information made available to it, and therefore that this Court should enter an injunction prohibiting the use of this information by Hooker and prohibiting Hooker from divulging it to others.

This Court, however, has held that Hooker is entitled to have available to it all of this information, except to the extent that this information was not actually used in the process and plant prior to January 1, 1963. It therefore appears that Velsicol is entitled to an injunction, prohibiting the use and divulgence of information which was not used by Velsicol in its process or plant prior to January 1, 1963. Although Article 4(B) requires that Hooker keep confidential even information made available to it to which it is entitled, we see no reason for including in the injunction a prohibition against divulgence of this information.

### Royalty Relief

This Court has held that Hooker is entitled to recover a royalty of one cent per pound on hex made by Velsicol at Memphis from the time at which production reached 100,000 pounds per month to January 1, 1963. If the parties do not agree and file a stipulation of this amount within twenty days, this Court will order a reference to a master to make a finding as to this amount.

Both parties will submit proposed judgments for consideration of the Court within twenty days.